# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DEBRA HENDRICKSON**
        **Plaintiff,**


    **v.**                                        **Case No. 20-C-1583**


**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

    Under the Social Security Act and its implementing regulations, a person will be found "disabled" if, due to severe physical or mental impairments, she is unable to perform her past relevant work ("PRW") or other jobs existing in significant numbers in the national economy. See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1520(a)(4). The regulations further provide that a person's age may significantly affect her ability to adjust to other work. See 20 C.F.R. § 404.1563(e). Accordingly, a person of "advanced" age (55 or older) limited to sedentary work and lacking transferable skills will (if unable to perform her past work) ordinarily be deemed disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.06.

    In the present case, plaintiff Debra Hendrickson alleged that she became disabled as of September 6, 2017, when she was 61 years old, due to a back impairment exacerbated by a work injury she suffered on that date. An Administrative Law Judge ("ALJ") concluded that plaintiff was, due to her back impairment, limited to sedentary work. The ALJ nevertheless denied plaintiff's application for disability benefits, concluding that she could perform PRW.

    Under the regulations, a claimant will be found not disabled if she is able to perform a

past relevant job, either as she <u>actually</u> performed it or as it is <u>generally</u> performed in the national economy. 20 C.F.R. § 404.1560(b)(2). Plaintiff held just one job—as a health unit coordinator ("HUC") at a hospital—within the relevant 15-year period. <u>See</u> 20 C.F.R. § 404.1560(b)(1) ("Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."). At plaintiff's hearing, a vocational expert ("VE") testified that the HUC position is generally performed at the light level. The VE further testified that, prior to her September 2017 injury, plaintiff actually performed her HUC job between the sedentary and light levels. However, when plaintiff returned to work in November 2017 her employer provided accommodations such that she then performed the job at the sedentary level, before she retired in January 2018.

In denying plaintiff's application, the ALJ concluded that plaintiff could return to the HUC position as she actually performed it from November 2017 to January 2018. The ALJ rejected plaintiff's argument that this two-month period constituted an "unsuccessful work attempt" ("UWA"). <u>See</u> 20 C.F.R. § 404.1574(c). Under the regulation, a period of six months or less will be deemed a UWA if the claimant stopped working because of her impairment or because of the removal of special conditions that took into account her impairment and permitted her to work. 20 C.F.R. § 404.1574(c)(3). The ALJ determined that plaintiff decided to take early retirement in January 2018, rather than leaving because she could not handle the demands of the job.

In this action for judicial review, plaintiff challenges the ALJ's conclusion on the UWA issue. She further argues that the ALJ erred in discounting certain limitations endorsed by her treating doctors and in finding her statements regarding her symptoms and limitations "not entirely consistent" with the record evidence.

2

## I. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in March 2018, alleging a disability onset date of September 6, 2017.  (Tr. at 162, 197.)  In her disability report, plaintiff stated that she stopped working on January 18, 2018, "[b]ecause of [her] condition(s)."  (Tr. at 201.)  She reported that she worked as a health unit coordinator from January 14, 1990, to January 18, 2018.  (Tr. at 202.)  This job required her to walk and stand six hours per day and lift up to 10 pounds.[1]  (Tr. at 203.)

In a function report, plaintiff wrote that her conditions limited her ability to walk long distances and stand for long periods of time.  Sitting too long also caused pain.  She had to lay down to take pressure off her lower back.  (Tr. at 209.)  In a physical activities addendum, plaintiff wrote that she could continuously sit for one hour, stand for five minutes, and walk for 15 minutes, and in a day sit for six hours, stand for one hour, walk for 40 minutes, and lift no more than 10 pounds.  (Tr. at 217.)  Plaintiff endorsed no memory or concentration problems in her pre-hearing reports.  (Tr. at 214.)

The agency denied the application initially in April 2018 (Tr. at 70, 85), based on the review of Mina Khorshidi, M.D., who concluded that plaintiff could perform the full range of sedentary work (Tr. at 67-68), with the agency reviewer classifying plaintiff's past HUC job as sedentary ("medical secretary" under the Dictionary of Occupational Titles) (Tr. at 68).  Plaintiff

---

[1]As the VE noted at the hearing, this falls between sedentary (lifting no more than 10 pounds, sitting about six hours, and standing/walking about two hours in an eight-hour workday) and light (lifting no more than 20 pounds and standing/walking a total of about six hours of an eight-hour workday).  See 20 C.F.R. § 404.1567(a), (b); SSR 83-10, 1983 SSR LEXIS 30, at *13-14.  The regulations explain that, even though the weight lifted may be very little, a job is in the light category "when it requires a good deal of walking or standing."  20 C.F.R. § 404.1567(b).

3

requested reconsideration (Tr. at 93), but in October 2018 the agency maintained the denial (Tr. at 82, 95), with Charles Kenney, M.D., agreeing that plaintiff could perform sedentary work (Tr. at 78-79).  Plaintiff then requested a hearing before an ALJ.  (Tr. at 100.)

In May 2019, plaintiff's primary physician, Dr. Sandra Scalzitti, prepared a report which limited plaintiff to sitting less than two hours in an eight-hour day, standing/waking less than two hours in an eight-hour day, and lifting no more than 10 pounds.  Dr. Scalzitti further opined that plaintiff would, due to problems with attention and concentration, be off task more than 30% of the workday; would likely need more than 10 unscheduled breaks during the workday due to her impairments; and would likely be absent more than four days per month due to her need for treatment and/or "bad days" with symptoms.  (Tr. at 878-79.)

## B.    Hearing

On July 23, 2019, plaintiff appeared with counsel for her hearing before the ALJ. (Tr. at 28.)  Plaintiff testified that she was then 63 years old, with a high school education.  She stopped working on January 18, 2018, explaining: "I had gone back to work after the accident and it was just too much walking and getting up and down and going to patient rooms for my back." (Tr. at 33.)  She explained that the accident occurred when she was in an elevator that malfunctioned and fell down a few floors.  (Tr. at 33.)

The ALJ then asked plaintiff about the circumstances of her leaving work:

Q      And so there are a number of references in the record, in fact there are three, to you retiring.  Is that what you did?

A      Well, I, it was too much for me so in January that's when I –

Q      Okay.  And that –

A      – it was too much.

4

Q      – so retirement in January of 2018?

A      Correct.

(Tr. at 35.)

Plaintiff testified that her job at the hospital involved answering phone calls, paging nurses, running to find nurses if they could not be reached, and going to patient rooms to give out Medicare notices.  (Tr. at 37.)  The elevator accident occurred on September 6, 2017, aggravating a deteriorating disc in her back.  (Tr. at 37-38.)  She was off work for a time after the accident, before returning with restrictions, initially to four hour shifts, then to six hour shifts, before retiring on January 18.  Asked if she could handle the six hour shifts, plaintiff responded: "Well it was, I was hurting, my back was hurting getting up and down and I couldn't walk some days.  I was holding on – they do have some rails on some of the hall[s], part of the hallway."  (Tr. at 38.)  Asked if she performed all of the same duties during the shorter shift, plaintiff testified: "If I ever had to lift anything heavy I would get help, that kind of stuff, you know.  But I would go into the rooms with my cane and hang on to something and give them their Medicare notices.  And then I would go back and answer the phone quick, if that was ringing, the phone was ringing all the time.  So, we were in and out of rooms and the, you know, phone was always ringing[.]"  (Tr. at 39.)  She retired on January 18, explaining: "I talked to my husband, I said it's too much, up and down and my legs would lock up on me in the hallways and stuff."  (Tr. at 39.)

Plaintiff appeared at the hearing with a walker, which she had started using a couple months earlier. (Tr. at 39.)  She used a cane after she returned to work.  (Tr. at 40.)  Plaintiff indicated that following her retirement she and her husband moved up north to Shawano.  (Tr. at 40.)  Prior to the move, they went up north and engaged in activities such as swimming,

5

boating, and fishing. (Tr. at 40.) After the accident, plaintiff's husband helped her walk down the pier and get on the boat. (Tr. at 40-41.)

Plaintiff testified that after she returned to work following the injury the employer never told her they were unhappy with her work, nor did they express any concern about the reduced hours. (Tr. at 42.) The ALJ asked whether, if she had not had the accident, she was planning on retiring in January 2018 or would have worked beyond. Plaintiff indicated that she wanted to work until March 5, 2018, her birthday. (Tr. at 43.) "So, I was going to retire in March." (Tr. at 44.) But she quit earlier because of her problems. (Tr. at 44.)

Plaintiff testified that she experienced pain going down her left leg and left foot drop. Sitting in a recliner with her feet up eased the pain. (Tr. at 45.) Standing made the pain worse. Her doctor prescribed a cane in September 2017. (Tr. at 46.) Plaintiff testified to a variety of treatment modalities, including physical therapy, medication, and injections. (Tr. at 47.) She experienced about 15 "bad days" per month, where she spent most of her time laying down. (Tr. at 47-48.) Her husband did the grocery shopping and her daughter did the cleaning and laundry. She testified that she could sit in a chair for four to six hours before getting up and walking around. (Tr. at 48.) She could, with the cane, stand for two minutes at most. She could lift two to five pounds. (Tr. at 49.) After she returned to work, she got help lifting heavier things. (Tr. at 52.)

The VE classified plaintiff's past job as a health unit coordinator as semi-skilled, light generally, between sedentary and light as performed. (Tr. at 53.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work, using a cane to ambulate. (Tr. at 53.) The VE said such a person could not do plaintiff's past work, generally or as performed, explaining that under both

6

scenarios the job required plaintiff to be on her feet more than two out of eight hours. (Tr. at 53-54.) The ALJ then asked plaintiff how much time she spent on her feet during her six hour shifts, and plaintiff responded "two at least." (Tr. at 55.) The ALJ asked the VE if that would change her answer, and the VE said yes, then the person could do the HUC job as performed. (Tr. at 56.) The ALJ then asked about a person limited to sedentary work, walking up to two hours, limited to a six hour shift, and lifting no more than two pounds. The VE responded such a person could do plaintiff's past work, as performed. (Tr. at 56.) Finally, the VE testified that employers would not tolerate more than one to two absences per month, 10% time off task, or three to four unscheduled breaks. (Tr. at 59.)

After the hearing, plaintiff submitted a July 25, 2019 report from Dr. Derek Orton, an orthopedic surgeon with whom she had consulted. Dr. Orton opined that plaintiff could sit about four hours and stand/walk two hours in an eight-hour day, rarely lift 20 pounds, and occasionally lift 10 pounds. He further opined that plaintiff would be off task more than 30% of the workday, would likely need eight unscheduled breaks during the workday, and would likely be absent more than four days per month. (Tr. at 1643-45.)

On September 13, 2019, the ALJ propounded interrogatories and issued a subpoena to Froedtert Hospital for plaintiff's personnel records. (Tr. at 157.) A human resources official wrote that on January 12, 2018, plaintiff "submitted her notice of resignation and cited her reason for leaving as retirement." (Tr. at 281.) The resignation was effective January 18, 2018. (Tr. at 289.) The official further indicated that plaintiff was on medical leave from September 13, 2017 to November 7, 2017. She returned to work on November 8, 2017, with restrictions on lifting, walking, and hours per shift, which the employer accommodated. Specifically, the employer received restrictions on November 2, 2018, indicating that plaintiff

7

could return to work a maximum of four hours per day until November 15, 2017, lifting 10 pounds maximum and occasionally walking, standing, and carrying light tools and files; as of November 16, 2017, she could work six hours per day, with the same restrictions. (Tr. at 287.) On December 22, 2017, the employer received notice that plaintiff could work a maximum of eight hours per day, again with sedentary restrictions, but on December 28, 2017, plaintiff was reduced to six hours per day. She voluntarily resigned on January 12, 2018, citing retirement as the reason. (Tr. at 288.) In her November 29, 2017, performance evaluation, plaintiff was generally noted to meet standards. (Tr. at 295-304.) However, she did receive a series of written warnings based on performance issues on July 15, 2017, July 27, 2017, and December 13, 2017. (Tr. at 325.)

On November 4, 2019, the ALJ advised plaintiff's counsel of the additional evidence received from the employer, affording counsel a chance to comment or request a supplemental hearing. (Tr. at 499.) In response, plaintiff argued that the work from November 8, 2017, to January 12, 2018 did not constitute PRW because it was a UWA, work for brief periods cannot be considered PRW, and accommodated work does not constitute PRW. (Tr. at 502.)

## C.    ALJ's Decision

On January 9, 2020, the ALJ issued an unfavorable decision. (Tr. at 10.) In rendering his decision, the ALJ followed the familiar five-step evaluation process.[2]

At step one, the ALJ determined that plaintiff engaged in SGA from November 15, 2017,

---

[2]Under this test, the ALJ determines (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) if not, whether she suffers from a severe impairment or combination of impairments; (3) if so, whether any of those impairments qualify as conclusively disabling under the Listing of impairments; (4) if not, whether the claimant can, given her residual functional capacity ("RFC"), perform her past work; and (5) if not, whether she can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4).

8

through January 18, 2018, but not thereafter. The ALJ noted that plaintiff was off work from September 7, 2017, the date of her injury, until November 1, 2017, when she returned for two hours per day. On November 15, 2017, she increased to four hours per day, and on November 29, 2017, to six hours per day (continuing that schedule until her retirement in January 2018). Given her hourly wage, her income reached the SGA level ($1700/month) as of November 15, 2017. (Tr. at 16.)

The ALJ rejected plaintiff's argument that this period constituted a UWA, stating:

> While the claimant stopped working within two months of returning to work and testified she left because she had difficulties performing her work tasks due to her impairment, this is not what the objective record shows. Instead, her employer notes at 23E-3 that they accommodated the claimant's work restriction and that **she was able to perform her normal job duties**. A review of her personnel file at 24E-4 also shows that the claimant initiated the retirement discussion on her own and that her stated reason for **resigning was retirement** (24E-3). Thus, the only reason she returned to work for a "brief period" was based on her retiring early on her own volition. As such, the representative's [UWA] argument fails. Additionally, a review of her personnel file shows no reprimands after she returned to work with her accommodations or any other objective evidence indicating she was unable to perform her job duties due to her impairment (24E). Markedly, the claimant testified she had planned to retire in March 2018 prior to her accident, suggesting she had a change of heart and merely moved up her retirement date by two months.

(Tr. at 16.)

At step two, the ALJ determined that plaintiff had the severe impairments of degenerative disc disease with radiculopathy and deep peroneal neuropathy at the left ankle. (Tr. at 16.) At step three, the ALJ determined that neither of these impairments met or medically equaled a Listing. (Tr. at 17.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform sedentary work except that she was limited to lifting no more than two pounds, must be allowed to use a cane for standing or walking, and can work no more than six hours per day. In making this

9

finding, the ALJ considered plaintiff's statements regarding her symptoms and limitations, as well as the medical opinion evidence.  (Tr. at 17.)

Plaintiff alleged disability due to degenerative disc disease.  Prior to the hearing, she asserted that these impairments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  At the hearing, she testified regarding her return to work and her retirement.  She also noted ongoing back pain, left leg pain, and left foot drop.  She further reported that she could only walk with her cane for two minutes, sit for six hours in a chair at one time, and lift two to five pounds.  Finally, she noted multiple bad days per month where she could not get out of bed.  (Tr. at 18.)

The medical evidence documented plaintiff's history of lumbar radiculopathy and spinal stenosis predating the alleged onset date.  She exacerbated her back condition in the elevator accident at work in September 2017.  An MRI that month showed disc and facet degeneration with moderate canal narrowing at L4-5 and L5-S1, as well as moderate foraminal stenosis on the left at L5-S1.  Examination that month also revealed diminished range of motion and moderate tenderness.  A November 2017 x-ray documented further abnormalities.  Plaintiff subsequently treated with Gabapentin, nerve blocks, steroid injections, and sacroiliac joint injections through March 2018.  Nevertheless, she evidenced an antalgic gait with the use of a cane, diminished range of motion, and tenderness to palpation in October 2017 and January 2018.  (Tr. at 18.)

In May 2018, plaintiff complained of left foot numbness and tingling, evidencing reduced strength in her left ankle and foot, consistent with left foot drop.  EMG and nerve conduction studies that month revealed deep peroneal neuropathy at the left ankle.  She continued to display reduced range of motion in her lumbar spine, diminished strength in her left ankle and

10

foot, and the use of a cane during evaluations despite receiving injections, therapy, and medication. Surgeons recommended she continue with conservative treatment, as the benefits of surgery were outweighed by the risks. (Tr. at 18.)

The ALJ found that while plaintiff's impairments could reasonably be expected to produce some of the symptoms of the types alleged, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence. (Tr. at 18.) The ALJ stated that the record failed to fully substantiate plaintiff's allegations of disabling symptoms. Plaintiff had planned to retire in March 2018 before her September 2017 work injury and moved her retirement up two months on her own volition with no mention of physical problems nor any reprimands for being unable to perform her position. "This suggests her lack of work is by choice and not her medical conditions." (Tr. at 19.)

The ALJ further concluded that the objective treatment notes did not support plaintiff's assertions of disabling symptoms. Plaintiff maintained a normal gait and coordination with negative straight leg raise testing during examination in September 2017 despite her recent exacerbation. In October 2017, she displayed intact balance, coordination, motor function, and the ability to sit comfortably. She also displayed normal strength, sensation, and reflexes in December 2017. In January 2018, she reported feeling much better with treatment and being in less pain since she was no longer working, and demonstrated normal strength. In June and July 2018, she was shown traveling to Northern Wisconsin, walking a lot, boating, and swimming despite her back and left ankle conditions. At subsequent 2018 evaluations, she exhibited normal strength in her upper and lower extremities (other than her left ankle/foot), negative straight leg raise testing, and symmetrical pulses. September 2018 treatment notes showed her progressing well in strength and core stability with physical therapy. In November

11

and December 2018, she reported spending a lot of time at her Northern Wisconsin lake cottage, as well as helping her mother-in-law. She also demonstrated normal range of motion, strength, sensation, and reflexes, as well as the ability to get on and off the exam table independently. More recent notes continued to show her making gains with physical therapy. Finally, contrary to her testimony, the record failed to show plaintiff needing to sit in a recliner, using a walker, or informing treatment providers she was having multiple bad days per month where she could not get out of bed. (Tr. at 19.)

As for the medical opinions, the ALJ found generally persuasive the opinions of treating provider Dr. Saleem Awan, the pain management specialist who treated plaintiff after her injury. Dr. Awan limited plaintiff to sedentary activities in September 2017, increasing her to four hours and then six hours by the end of November 2017. The ALJ noted that Dr. Awan was a highly trained medical provider, who personally observed and examined plaintiff; that his restrictions were generally consistent with how plaintiff performed her job on her return, which her employer indicated allowed her to perform her normal job duties prior to her retirement; and that his assertions were generally consistent with plaintiff appearing to sit comfortably in a chair, have a normal gait with the use of a cane, and display full strength (outside of her left ankle/foot), intact coordination, balance and sensation at multiple evaluations. (Tr. at 20.) For similar reasons, the ALJ found generally persuasive the opinions of the agency medical consultants, Drs. Khorshidi and Kennedy, who restricted plaintiff to sedentary work. (Tr. at 20.)

On the other hand, the ALJ found the opinion of treating provider Dr. Scalzitti, who indicated plaintiff could not perform even sedentary work on a regular and continuing basis, not persuasive. Dr. Scalzitti's assertions regarding plaintiff's alleged limitations in attention, concentration, and pace conflicted with plaintiff's pre-hearing reports alleging no limitations in

12

these areas, as well as her employer's report that she was able to perform her normal job duties. Likewise, Dr. Scalzitti's assessed physical restrictions were greatly out of proportion to her own treatment notes, which showed plaintiff having normal range of motion, strength, sensation, and reflexes as well as the ability to get on and off the exam table independently, spend time at her cabin, and help her mother-in-law. (Tr. at 20.)

The ALJ also found not persuasive the opinion of treating provider Dr. Orton, who opined that plaintiff could not sustain less than sedentary work on a regular and continuing basis. Dr. Orton examined plaintiff on only two occasions and merely provided a check-the-box form with very minimal explanation. Likewise, his assertions regarding plaintiff's attention, concentration, and pace conflicted with plaintiff's pre-hearing reports and ability to perform her normal job duties upon her return to work. In addition, his reported physical limitations and need for plaintiff to miss four-plus days per month were not congruent with plaintiff returning to work for six hour shifts, with accommodations but without needing to miss multiple days of work and no evidence of any reprimands related to poor performance. Finally, the ALJ stated that plaintiff's documented daily activities suggested better functioning than Dr. Orton indicated. (Tr. at 20.)

At step four, the ALJ determined that plaintiff could return to her past relevant work as a health unit coordinator. The ALJ found that this job qualified as past relevant work, as plaintiff performed the job within the past 15 years, as recently as January 2018; she performed the job long enough to learn it, as she held the position for just under 28 years; and she earned enough for the job to qualify as SGA, as she regularly made over $30,000 from 2008 through 2017. (Tr. at 21.) The ALJ noted that even limited to six (or four) hours per shift, her earnings exceeded the $1700/month threshold for SGA. (Tr. at 21.)

13

The ALJ then reiterated his UWA finding, repeating verbatim the block quote set forth on page 9 above. The ALJ also rejected plaintiff's argument that accommodated work does not constitute past relevant work. (Tr. at 21.) The ALJ quoted from POMS DI 25005.020E, which indicates:

> If the claimant's RFC reflects an inability to sustain a 40-hour workweek and the claimant has part-time PRW, both the RFC and the PRW description need to be detailed enough to do a function-by-function evaluation of the claimant's ability to do his or her past relevant part-time work.

(Tr. at 21-22.) In this case, the ALJ noted, the RFC matched plaintiff's exact testimony on how she performed her job upon returning to work. (Tr. at 22; <u>see also</u> Tr. at 19, "Notably, these are the accommodations the claimant worked within prior to her retirement.".)

The ALJ further quoted from POMS DI 25005.020F, which indicates:

> If a previous employer offered accommodations that allowed the claimant to perform PRW with his or her impairment, and the claimant retains the ability to do the PRW with the accommodations in place, find the claimant able to do PRW as he or she performed it even if the accommodations might not be available in other workplaces or if work ceased because the employer removed the accommodations.

(Tr. at 22.) The ALJ found that putting plaintiff back to her accommodated work was appropriate. (Tr. at 22.)

The ALJ adopted the VE's testimony that plaintiff could perform her past relevant work as she actually performed it given her age, education, work history, and RFC including her accommodations. "This testimony is clearly consistent with the claimant returning to work at the substantial gainful activity level with accommodations and continuing to work the position until she voluntarily decided to retire two months earlier than her originally planned retirement date." (Tr at 22.) The ALJ accordingly found plaintiff not disabled. (Tr. at 22.)

On September 15, 2020, the Appeals Council denied review (Tr. at 1), making the ALJ's

decision the final decision of the Commissioner on plaintiff's application.  See Kaplarevic v. Saul, 3 F.4th 940, 942 (7th Cir. 2021).  This action followed.

## II.  DISCUSSION

### A.    Standard of Review

An ALJ's decision will be affirmed if it was supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Butler v. Kijakazi, 4 F.4th 498, 500 (7th Cir. 2021).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by re-weighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  Beardsley v. Colvin, 758 F.3d 834, 836-37 (7th Cir. 2014).  Reversal and remand may be required, however, if the ALJ committed an error of law, or if the ALJ based the decision on serious factual mistakes or omissions.  Id. at 837.  The court's review is also limited to the reasons articulated by the ALJ in his decision.  Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010).

### B.    Plaintiff's Claims

#### 1.    PRW/UWA

The ALJ denied plaintiff's claim based on his finding that she could perform the HUC job, as she actually performed it from November 2017 to January 2018.  Plaintiff argues that this short-term period of part-time work cannot be considered PRW; rather, it constituted a UWA.  (Pl.'s Br. at 8.)

The parties agree on the applicable UWA criteria, and they further agree that plaintiff satisfies two of those criteria.  First, a "significant break" (at least 30 consecutive days) in the

15

continuity of plaintiff's work preceded the period at issue. 20 C.F.R. § 404.1574(c)(2). That is, she was off work entirely from September 13, 2017, to November 7, 2017. (Tr. at 287.) Second, this work period lasted less than six months. 20 C.F.R. § 404.1574(c)(3). That is, she worked at the SGA-level from November 15, 2017, to January 28, 2018. (Tr. at 16.) The parties disagree over the third factor: whether plaintiff "stopped working . . . because of [her] impairment or because of the removal of special conditions that took into account [her] impairment and permitted [her] to work." 20 C.F.R. § 404.1574(c)(3); see also Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The relevant question thus is whether it was Stevenson's disability, or some other circumstance, that brought an end to her employment[.]"). In ruling against plaintiff on this issue, the ALJ found (1) that plaintiff left work voluntarily, taking early retirement, and (2) that the employer's personnel records contained no reprimands or other evidence that she was unable to perform her job duties due to her impairment. (Tr. at 16.)

Plaintiff argues that the ALJ placed too much significance on the references in the record to "retirement." She notes that people may retire for a variety of reasons, e.g., spending more time with family, pursuing other interests, or diminishing abilities. In this case, plaintiff testified that she retired because of her declining health. (Pl.'s Br. at 10; Tr. at 35, 38-39.) She explained that while she was planning to retire in March 2018, she quit earlier due to her medical problems. (Tr. at 44.) Plaintiff notes that her testimony in this regard is consistent with the statement in her March 2018 disability report that she stopped working in January 2018 "[b]ecause of [her] condition(s)." (Tr. at 201.) She contends that her testimony that she was forced to move up her retirement date is further corroborated by a December 2017 medical note in which she stated that she is "hoping to retire at 62," i.e., in March 2018. (Tr. at 622.)

16

I tend to agree with plaintiff on this point.  The issue is not <u>whether</u> plaintiff retired but <u>why</u>.  The ALJ suggested that plaintiff "merely moved up her retirement date by two months" (Tr. at 16), but if she did so "because of" her impairment the regulation would appear to be satisfied; the extent of the change would be irrelevant.  The Commissioner does not specifically address this argument.

In any event, the matter must be remanded because the ALJ overlooked evidence that directly contradicted the second part of his conclusion.  Contrary to the ALJ's finding that plaintiff received "no reprimands after she returned to work" (Tr. at 16), on December 27, 2017, plaintiff was given a third written warning for poor work performance.  The reprimand was based on a December 13, 2017, incident in which a technician contacted plaintiff to advise that the hospital's virtual ICU monitoring system was down; plaintiff put the technician on hold and failed to relay the message to nursing staff.  When later questioned, plaintiff said that she did not remember the call.  The warning stated that plaintiff's failure to communicate the message to the nurse that the monitoring system was down had the potential to impact patient safety.  (Tr. at 325.)  The document further stated that this was plaintiff's final warning; further incidents of poor work performance would result in dismissal.  (Tr. at 326.)[3]

The Commissioner responds that the only evidence supporting plaintiff's contention that she quit due to her impairments consists of her own testimony and statements.  (Def.'s Br. at 16.)  In considering why a work effort ended or was reduced to non-SGA level, the agency does

---

[3]Plaintiff also notes a decline in the ratings between her September 2016 and November 2017 performance evaluations.  (Pl.'s Br. at 13.)  As the Commissioner notes in response, plaintiff's November 29, 2017, performance evaluation, provided just two weeks after her return to work, reflected her performance over the entire year and thus says little about whether she was able to do the job with accommodations.  (Def.'s Br. at 18.)

17

not rely solely on information from the worker; the agency will also consider information from the employer, including whether the claimant was frequently absent and whether her job performance was unsatisfactory because of the impairment. SSR 84-25, 1984 SSR LEXIS 17, at *8-9. The ALJ followed that guidance here in seeking information from Froedtert Hospital, which contradicted plaintiff's statements regarding why she quit. (Def.'s Br. at 17.) The Commissioner specifically notes the employer's statement that, with accommodations, plaintiff "was able to perform her normal job duties." (Tr. at 280.) When she contacted her employer about leaving work in January 2018, plaintiff listed "retirement" as her only reason for leaving. (Tr. at 289-90.) And at no point prior to retiring did plaintiff inform her employer that she was unable to do her job or request any additional accommodations. (Def.'s Br. at 15.)

As plaintiff notes in reply, her claim is supported by more than her own statements, i.e., the final written warning given by the employer on December 27, 2017. (Pl.'s Rep. Br. at 2.) The Commissioner acknowledges this warning but argues that it should not be considered in isolation. (Def.'s Br. at 17.) Plaintiff received two previous warnings in July 2017 (before the alleged onset date) for similar shortcomings (failing to follow protocol in tracking a patient and failing to relay information). (Tr. at 327, 329.) The Commissioner argues that it is clear from a review of her work history that plaintiff's deficiencies after the accident were not related to her impairments but rather consistent with her previous work performance issues. (Def.'s Br. at 18.) However, the ALJ did not say that; he overlooked the December 2017 warning; and "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

Nor can I find any error in failing to consider this evidence harmless. See Spiva v.

18

<u>Astrue</u>, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."). As plaintiff notes in reply, to the extent her performance issues in July 2017 and December 2017 related to failure to relay important information, during both time periods she was experiencing exacerbations of her back impairment, which may have impacted her memory and cognition. (Pl.'s Rep. Br. at 3-4; Tr. at 573-74, discussing a 6/19/17 trip and fall.) And as will be discussed further below, the ALJ also relied on the alleged absence of reprimands in discounting the treating source opinions and plaintiff's statements regarding her symptoms and limitations. The matter must be remanded so the ALJ can consider this important evidence.

### 2. Treating Sources

Plaintiff next argues that the ALJ erred in discounting the opinions of Drs. Scalzitti and Orton. (Pl.'s Br. at 13.) These doctors opined that, <u>inter alia</u>, plaintiff would be off task more than 30% of the workday, would need multiple unscheduled breaks, and would be absent more than four days per month. (Tr. at 878-79, 1643-45.) The VE testified that such limitations would preclude employment. (Tr. at 58-59.)

Under agency regulations, medical opinions are evaluated based on a number of factors, including supportability (how much support the source offers for the opinion), consistency (how consistent the opinion is with the other evidence), relationship with the claimant (how often the source saw the claimant and for what purpose), specialization (whether the source is a specialist in the impairment at issue), and familiarity with the other evidence in the record or an understanding of the disability program's policies and evidentiary

19

requirements. 20 C.F.R. § 404.1520c(c). The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).

As indicated above, the ALJ found these opinions inconsistent with plaintiff's ability to return to work in November 2017, with the treatment notes reflecting relatively good functioning, and with plaintiff's activities such as spending time at her cabin and helping her mother-in-law. (Tr. at 20.) The ALJ also noted that Dr. Orton only examined plaintiff on two occasions and provided a check-the-box form containing minimal supporting explanation. (Tr. at 20.)

Plaintiff's argument that the ALJ cherry-picked positive exam findings from the treatment notes falls flat. (Pl.'s Br. at 16.) As the Commissioner notes, a holistic reading of the ALJ's decision reveals his consideration of much of the evidence plaintiff cites. (Def.'s Br. at 11.) Certainly, there is no indication that he overlooked an entire line of medical evidence contrary to his conclusion. See Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021) (noting that an ALJ need not discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability). The ALJ also stood on solid ground in citing Dr. Orton's limited relationship with plaintiff and his use of a check-box form without supporting explanation. (See Pl.'s Br. at 18.) It appears Dr. Orton saw plaintiff just twice for surgical consults (Tr. at 1245, 1259), providing no treatment thereafter, and the Seventh Circuit has affirmed the rejection of unexplained check-box forms. McFadden v. Berryhill, 721 Fed. Appx. 501, 505 (7th Cir. 2018). However, plaintiff's other arguments have merit.

The ALJ found that the doctors' "assertions regarding the claimant having significantly reduced attention, concentration, and pace are not congruent with the claimant's prehearing reports of no deficits in concentration, completing tasks, or paying attention, as well as her

20

employer indicating the claimant was able to perform her normal job duties upon her return to work with no evidence of any reprimands." (Tr. at 20.) As indicated above, plaintiff did receive a reprimand in December 2017, based on her failure to relay a message, which she later told her supervisor she did not recall receiving. (Tr. at 325.) And, while plaintiff did not reference memory problems in her pre-hearing reports, the treatment records do reflect issues with memory, suspected to be related to pain and medications. (Tr. at 592, 1612.)

The ALJ noted that plaintiff spent a lot of time at her cabin up north and helping her mother-in-law (Tr. at 20), but he did not explain what was involved in those activities or how they undercut the doctors' opinions. Earlier in his decision, the ALJ stated that in June and July 2018, plaintiff traveled to Northern Wisconsin, walking a lot, boating, and swimming despite her impairments. (Tr. at 19, citing Ex. 6F-8, Hearing Testimony.) Exhibit 6F-8 corresponds to the signature page of a May 31, 2018 note, which says nothing about these activities. (Tr. at 783.) Perhaps the ALJ meant exhibit 5F-8, a June 19, 2018 note, in which plaintiff expressed concern about a possible tick bite when she was up in Northern Wisconsin. (Tr. at 764.) But this note is also silent about the extent of her activities. (Tr. at 764.) During her testimony, plaintiff discussed going up north, swimming, boating, and fishing, but she added that her husband helped her walk down the pier after she hurt her back. (Tr. at 40.) The ALJ asked about a reference to her doing a lot of walking up there on occasion, and plaintiff responded: "Probably just down the long driveway and back[.]" (Tr. at 41.) Plaintiff added that she did not walk without an assistive device because she was afraid of falling. (Tr. at 41.) She further stated that her husband helped her get on the boat, and she would never go alone. (Tr. at 42.) The record appears to contain no information regarding what plaintiff did to help her mother-in-law. In sum, the ALJ did not explain why plaintiff's activities were inconsistent with the alleged

21

limitations, nor is any such inconsistency obvious. Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017); see also Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize [the] differences [between activities of daily living and activities of a full-time job] is a recurrent . . . feature of opinions by administrative law judges in social security disability cases."); Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities.").

In response, the Commissioner cites records in which plaintiff told a therapist she had been doing a lot of walking at the cabin and that she had been swimming. (Def.'s Br. at 14.) However, the Commissioner cites no evidence explaining what was involved in plaintiff's assistance to her mother-in-law. In any event, judicial review is limited to the reasons the ALJ provided. The Commissioner also contends that the ALJ did not equate plaintiff's activities with full-time work but rather cited them as evidence that she was not as limited as alleged. (Def.'s Br. at 10, citing Morrison v. Saul, 806 Fed. Appx. 469, 475 (7th Cir. 2020) (rejecting a Bjornson argument where the ALJ did not equate daily activities with an ability to work full-time but rather found the activities inconsistent with the level of limitation alleged).) However, the problem here is that the ALJ did not explain how the activities conflicted with the limitations alleged by plaintiff or her doctors. The matter must be remanded on this basis as well.

### 3.  Credibility

Plaintiff also argues that the ALJ erred in finding that the record failed to fully substantiate her allegations of disabling symptoms. (Pl.'s Br. at 18.) As the ALJ acknowledged, symptom evaluation is a two-step process. (Tr. at 17.) First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4,

22

at *5.  Second, once such an impairment has been shown, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received for relief of the pain or other symptoms.  Id. at *18-19.  On review, the court affords considerable deference to the ALJ's finding, reversing only if it is "patently wrong."  Ray v. Berryhill, 915 F.3d 486, 490 (7th Cir. 2019); see Cullinan, 878 F.3d at 603 ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support.").

In this case, the ALJ found that plaintiff's impairments could reasonably be expected to produce some of the symptoms alleged.  However, he found her statements concerning the intensity, persistence, and limiting effects of these symptoms not entirely consistent with the evidence.  (Tr. at 18.)

In support of this finding, the ALJ first stated that plaintiff "had planned to retire in March 2018 before her September 2017 work injury and moved her retirement up two months on her own volition with no mention of physical problems nor any reprimands for being unable to perform her position.  This suggests her lack of work is by choice and not her medical conditions."  (Tr. at 19, record citation omitted.)  As  discussed above, the ALJ overlooked evidence that plaintiff received a reprimand in December 2017.

Second, the ALJ concluded that the objective medical evidence did not support plaintiff's assertions of disabling symptoms.  Plaintiff alleges that the ALJ cherry-picked in making this

23

finding. (Pl.'s Br. at 20-22.) As also discussed above, this is not the sort of argument that would alone support reversal and remand; it is the ALJ's job to weigh the evidence, not the court's; and plaintiff makes no argument that the ALJ overlooked an entire line of medical evidence. See Deborah M., 994 F.3d at 788 (noting that an ALJ is prohibited only from ignoring an entire line of evidence that supports a disability finding). However, to the extent the ALJ also relied on plaintiff's trips up north and assistance to her mother-in-law in evaluating credibility, the finding was flawed, as he provided no explanation as how those activities undermined her statements. See Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the 'inconsistencies' between Zurawski's activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence.").

Finally, the ALJ found that the record failed to show plaintiff needing to sit in a recliner, using a walker, or informing treatment providers she was having multiple bad days per month where she could not get out of bed. (Tr. at 19.) Plaintiff argues that the medical evidence of her variable functioning supports these allegations (Pl.'s Br. at 22), but as the Commissioner notes, the ALJ discussed much of this evidence or evidence of a similar nature (Def.'s Br. at 14). Plaintiff fails to cite any specific evidence undermining the ALJ's finding on this point. Nevertheless, given the other errors noted above, the matter must be remanded for reconsideration of plaintiff's statements.

**4.    Remedy**

"When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge. In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits." Kaminski v. Berryhill, 894 F.3d 870, 875 (7th Cir. 2018). Plaintiff

24

seeks a judicial award here, arguing that because her work from November 2017 to January 2018 was clearly a UWA there is no basis for denial of her claim.  (Pl.'s Br. at 23-24.)

However, the primary error in the ALJ's decision relates to his failure to consider significant evidence undermining his UWA determination, i.e., the December 2017 reprimand. This error permeates his evaluation of the treating source reports and plaintiff's credibility.  The ALJ also failed to explain his reliance on plaintiff's activities in discounting the medical opinions and plaintiff's statements.

> The usual remedy when an ALJ fails to develop the record and/or consider important evidence is remand for further proceedings.  See, e.g., Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 355-57 (7th Cir. 2005).  This is so because it is the ALJ's job, not the reviewing court's, to weigh competing evidence and determine in the first instance whether the claimant is disabled.  See Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993); see also Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013) (explaining that the court will not re-weigh the evidence or substitute its judgment for the ALJ's).  A judicial award of benefits is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports but one conclusion—that the applicant qualifies for disability benefits.  Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011).

Charles v. Colvin, No. 14-C-513, 2014 U.S. Dist. LEXIS 161296, at *3 (E.D. Wis.  Nov. 18, 2014); see also Dudley T. v. Comm'r of Soc. Sec., No. 4:17-cv-04264-JEH, 2019 U.S. Dist. LEXIS 43475, at *23-24 (C.D. Ill. Mar. 18, 2019) (remanding where the ALJ failed to properly consider limited daily activities); Hunt v. Astrue, 889 F. Supp. 2d 1129, 1149 (E.D. Wis. 2012) (remanding for reconsideration of medical opinions and claimant credibility).

I will recommend that on remand the Commissioner assign the matter to a different ALJ, as the manner in which the ALJ disposed of this claim suggests a strong commitment to denial. See Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996); Windus v. Barnhart, 345 F. Supp. 2d 928, 952 (E.D. Wis. 2004).  The Commissioner argues that the record does not reveal bias.

(Def.'s Br. at 19.)  I agree and "therefore do not order, but merely recommend, that the case be transferred."  <u>Sarchet</u>, 78 F.3d at 309.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

26